## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSANNE H. LINN and | : | **Civil Action No. 02-4417** |
| MELISSA KNESZ, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | **JURY TRIAL DEMANDED** |
| NORTHAMPTON COUNTY, | : | |
| NORTHAMPTON COUNTY | : | |
| DEPARTMENT OF CORRECTIONS, | : | |
| TODD BUSKIRK, WARDEN, | : | |
| AFSCME LOCAL 2549, | : | |
| | : | |
| Defendants. | : | |

## O R D E R

AND NOW, this _____ day of _____, 2003, upon consideration

of the Joint Motion in Limine of All Defendants to Preclude the Admission of Evidence

Regarding the Tredinnick Report or Documents Related Thereto, With Amended Exhibits, it is

hereby ORDERED that Defendants' Motion is GRANTED.

BY THE COURT:

_____

Brody, J.

946910v1

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSANNE H. LINN and<br>MELISSA KNESZ, | : | Civil Action No. 02-4417 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| NORTHAMPTON COUNTY,<br>NORTHAMPTON COUNTY<br>DEPARTMENT OF CORRECTIONS,<br>TODD BUSKIRK, WARDEN,<br>AFSCME LOCAL 2549, | : | |
| | : | |
| Defendants. | : | |

### JOINT MOTION IN LIMINE OF ALL DEFENDANTS TO PRECLUDE THE ADMISSION OF EVIDENCE REGARDING THE TREDINNICK REPORT AND DOCUMENTS RELATED THERETO, WITH AMENDED EXHIBITS

Defendants, by and through their undersigned counsel, hereby move for an Order

precluding Plaintiffs from introducing evidence regarding the Tredinnick Report and documents

related thereto. The grounds for this motion are set forth in the accompanying Brief, which is

incorporated herein by reference.

Linda M. Martin, Esquire
John R. Bielski, Esquire
Willig, Williams & Davidson
1845 Walnut Street
24th Floor
Philadelphia, PA 19103
(215) 656-3600

Attorneys for Defendant
AFSCME Local 2549

Dated: August 11, 2003

David J. MacMain, Esquire
L. Kristen Blanchard, Esquire
Dennis G. Young, Jr., Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA 19109
(215) 772-1500

Attorneys for Defendants,
Northampton County, Northampton County,
Department of Corrections, and Todd Buskirk

Dated: August 11, 2003

946910v1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

SUSANNE H. LINN and    :  **Civil Action No. 02-4417**
MELISSA KNESZ,      :
             :
    **Plaintiffs,**     :
             :
    **v.**        :
             :  **JURY TRIAL DEMANDED**
NORTHAMPTON COUNTY,   :
NORTHAMPTON COUNTY    :
DEPARTMENT OF CORRECTIONS, :
TODD BUSKIRK, WARDEN,   :
AFSCME LOCAL 2549,    :
             :
    **Defendants.**    :

**BRIEF IN SUPPORT OF JOINT MOTION IN LIMINE TO PRECLUDE
THE ADMISSION OF EVIDENCE REGARDING
THE TREDINNICK REPORT AND DOCUMENTS RELATED THERETO,
<u>WITH AMENDED EXHIBITS</u>**

## I. <u>INTRODUCTION AND FACTS</u>

   This is an employment discrimination case. Plaintiffs Susanne Linn and Melissa Knesz

(collectively, "Plaintiffs"), have asserted claims against Defendants Northampton County,

Northampton County Department of Corrections, Todd Buskirk, and AFSCME Local 2549

based upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et seq.</u>, the Public

Employee Relations Act, 43 P.S. § 1101.201 <u>et seq.</u>, and the Pennsylvania Human Relations Act,

43 P.S. §951 <u>et seq.</u> (<u>See</u> copy of First Amended Complaint, attached hereto as Exhibit "A").

### A.   <u>EEOC and Federal Complaints</u>

   On or about March 29, 2001, Plaintiffs Susanne Linn and Melissa Knesz filed complaints

with the Equal Employment Opportunity Commission alleging employment discrimination on

the basis of sex. (<u>See</u> copies of their Complaints, attached hereto as Exhibit "B"). The

complaints contained allegations similar to those advanced in the First Amended Complaint filed

in the instant matter, to wit, complaints of disparate treatment based upon sex.

On or about December 4, 2002, Plaintiffs filed a First Amended Complaint with this

Court, alleging discrimination only on the basis of sex.

**B.**       **The Tredinnick Report**

Although Plaintiffs have not identified it as part of their Rule 26 Disclosures or in

response to specific discovery requests seeking identification of all documents upon which they

intend to rely at trial, Plaintiffs' counsel asked several witnesses during depositions about a

document called the Tredinnick Report.

The Tredinnick Report ("Report") is a 61-page document written by former State Police

Officer Arthur Tredinnick ("Tredinnick"). Tredinnick was hired by then-Director of Corrections

Cynthia Marakovits to investigate the no-confidence vote of Jose Garcia, then Union president,[1]

by union members. In the course of preparing the Report, Tredinnick interviewed over 60 COs,

as well as over 20 inmates and ex-inmates, and asked those individuals to air their grievances

regarding the manner in which the jail was being run. The subjects that arose in the interviews

of the COs covered many topics, including the "work release" program applicable to inmates and

differential treatment of inmates, information "leaks" from the jail to the media, and

inappropriate fraternizing among officers. (A **sealed** copy of the Tredinnick Report is attached

hereto as Exhibit "C").

The Report has been controversial since its production, and has been the subject of

several discovery battles in more than one litigation matter. For example, in the matter of Miklas

v. Northampton County, et al., Civ. No. 01-CV-2131 (E.D. Pa.), Defendants filed a Motion for

---

[1] Presently, Jose Garcia is the Internal Affairs Investigator at Northampton County Prison.

Protective Order to prevent the production of the report. (See copy of the Motion for a

Protective Order, and Memorandum in Support Thereof, attached hereto as Exhibit "D").

Likewise, in the Doe matter, Defendants refused to produce the report until Plaintiff's counsel

promised to maintain the confidentiality of the report. (See copy of the correspondence

regarding confidentiality, attached hereto as Exhibit "E").

The Tredinnick Report is, at best, highly flawed, in that while Tredinnick listed the litany

of complaints he heard from employees and inmates, he never actually attempted to verify the

veracity of any of the allegations. Indeed, Tredinnick failed to take even the initial step of

interviewing the individuals accused of various misdeeds to obtain their side of the story. The

entire Report consists primarily of hearsay and few, if any, reports based upon first-hand

knowledge of the "witnesses" interviewed.

Moreover, the limited testimony in this matter regarding the Report revealed that it

contains double hearsay, fails to properly attribute statements, and, in at least one instance,

misquotes an individual and implies a negative meaning to the misquote when the speaker in fact

meant nothing negative by his statement.

For example, Lieutenant William Beers was asked during his deposition about his alleged

statements to Tredinnick that Internal Affairs Investigator Lieutenant Jose Garcia was a "snake"

and was not to be trusted.

> Q. Do you trust Lieutenant Garcia?
>
> A. Yes.
>
> Q. Did you ever refer to him as a snake?
>
> A. No.
>
> Q. Do you have any idea why Arthur Tredinnick would have in this report
> that you considered Garcia a snake and you don't trust him?

A. I never made that statement. I have no clue.

Q. You never talked to Arthur Tredinnick?

A. Yes, I did. . . I sat down and he asked me a couple questions. I just gave him general answers. . .  He asked me what I thought about [Jose] Garcia and I said he was a sneak. I didn't say snake.

Q. What did you just say?

A. Sneak. He is a friend of mine, but he is a sneak. He does his job. That's all I basically said.

Q. What did you mean that Lieutenant Garcia is a sneak?

A. He likes to find things out in his investigations. Sometimes he asks certain questions to find out what you know or he would point blank ask you straight out if you didn't have any knowledge. Then he would ask another person to see if they had the knowledge. It's just his nature. That's the way he was. I was a CO with him. I have known him for 20 years.

Q. You it's his nature to be --

A. Sneaky. I don't mean it in a bad sense, though.

Beers dep.[2] at 45-47.

A further example of the unreliable nature of the Tredinnick Report is found in testimony

by CO Barbara Morgan.

Q. Do you remember talking to Arthur Tredinnick? Do you remember telling him that [Defendant Todd] Buskirk hates women and talks down to them expressing that, quote: I bet he cringes every time he has to take orders from the director, end quote.

A. I was repeating what someone else said.

Q. You're saying that wasn't your opinion you were giving, you were just repeating what someone else said?

A. Right.

Q. Who said that?

---

[2] "Beers dep." refers to pages from the transcript of Lt. William Beers, taken on July 2, 2003, a copy of which is attached hereto as Exhibit "F."

946910v1

A.  It was somebody - - I can't remember.

Morgan dep.[3] at 15.

Significantly, the Report makes no reference whatsoever to either Plaintiff or any events about which Plaintiffs complained in their EEOC complaints or the instant litigation. In short, the Report is flawed, unreliable and irrelevant.

C.        **Doe v. Todd Buskirk, et al.**

Doe v. Todd Buskirk, et al., Civ. No. 00-CV-3368 (E.D. Pa., Brody, J.) was a race and disability discrimination case filed by an inmate of the Northampton County Department of Corrections. (See copy of Doe Amended Complaint, attached hereto as Exhibit "H"). Doe alleged, inter alia, that he was wrongfully denied medical treatment and a position in the "work release" program because of his race and his medical condition. The Doe matter did not involve claims of gender discrimination.

On July 11, 2003, three (3) days after the close of discovery, Plaintiffs revealed for the first time[4] that they intended to rely upon documents in the matter of Doe v. Todd Buskirk, et al., to support their claims in the instant litigation.[5] The revelation occurred because during depositions, Plaintiffs' counsel asked several witnesses about the Tredinnick Report. AFSCME counsel asked Plaintiffs' counsel on several occasions to produce this document, and only days before the close of discovery, Plaintiffs' counsel Jordan Yeager, Esquire, finally invited AFSCME counsel to his office to review the Tredinnick Report, as well as "other" documents

---

[3] "Morgan dep." refers to pages from the transcript of CO Barbara Morgan, taken on June 27, 2003, a copy of which is attached hereto as Exhibit "G."

[4] Plaintiffs did not reveal in their Rule 26 Disclosures or responses to discovery that they intended to rely upon the entire file from the Doe litigation. The Doe litigation involved the exchange of **thousands** of pages of documents.

[5] Doe settled out of court.

from "other cases" upon which Plaintiffs intended to rely at trial. AFSCME counsel asked Mr.

Yeager to simply produce those documents, but he replied that there were "three (3) boxes of

documents" and therefore it would be easier for AFSCME counsel to review them at his office

because of the volume of documents.

Counsel for Northampton Defendants learned of this intended document review from

AFSCME counsel and accompanied AFSCME counsel John Bielsky, Esquire, to the document

review at Mr. Yeager's office on July 11, 2003. Upon arrival, Mr. Yeager expressed his

displeasure with the presence of counsel for the Northampton Defendants. As it turns out, the

presence of counsel was necessary as the Northampton Defendants learned for the **first time** in

this litigation that Plaintiffs intended to rely upon the **entire** <u>Doe</u> file to support their case.

## II.    **ARGUMENT**

### A.        **This Court May Properly Rule On This Motion in Limine.**

The United States Court of Appeals for the Third Circuit has approved the use of pre-trial

motions <u>in limine</u> to narrow the evidentiary issues for trial and eliminate unnecessary trial

interruptions. <u>Bradley v. Pittsburgh Bd. of Educ.</u>, 913 F.2d 1064, 1069 (3d Cir. 1990).

### B.    **The Tredinnick Report is in No Way Relevant to Claims of Gender Discrimination.**

Putting aside for the moment the multiple levels of hearsay discussed above and below,

the Report is irrelevant to Plaintiffs' claims of discrimination on the basis of sex.

Fed. R. Civ. P. 401 provides that "[r]elevant evidence" means evidence having any

tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence. Fed. R. Civ. P.

401. Rule 402 provides that evidence which is not relevant is not admissible. Fed. R. Civ. P.

402.

946910v1

Allegations of discriminatory practices do not automatically render admissible any document pertaining to any type of discrimination. See Oaks v. City of Philadelphia, No. 99-CV-2854, 2002 U.S. Dist. LEXIS 12151, at *21 (E.D. Pa. April 30, 2002) (writing that to the extent that "statements concern gender discrimination, they are not relevant" to claims based on race), affirmed 2003 U.S. App. LEXIS 4907 (3d Cir. Mar. 13, 2003); Simonetti v. Runyon, No. 98-2128, 2000 U.S. Dist. LEXIS 11407, at *16-*17 (D.N.J. Aug. 7, 2000) (writing that pursuant to Fed. R. Civ. P. 401, a plaintiff may not use evidence of one type of discrimination to prove discrimination of another type); Rauh v. Coyne, 744 F. Supp. 1181, 1183 (D.D.C. 1990) (finding that a plaintiff alleging gender discrimination may not introduce evidence of racial discrimination because it is not relevant under Federal Rules of Evidence 401).

In Oaks, the court examined the admissibility of a report issued by a mayoral task force on police discipline. 2002 U.S. Dist. LEXIS, at *20-21. The report recited statements from numerous witnesses who alleged that race and gender played a role in the imposition of discipline. Id. at *21. The Oaks Court held that evidence involving gender discrimination was inadmissible in a race discrimination suit. Id. Moreover, after questioning the reliability of hearsay scattered throughout the report, the Court found that the report was "entirely speculative and clearly insufficient to raise a reasonable inference of discrimination in [p]laintiff's case." Id. at *22.

Here, as in Oaks, the Tredinnick Report is void of any relevant allegations of gender discrimination and is "clearly insufficient to raise a reasonable inference of discrimination." See id. The Report concerns the "no-confidence" vote of non-party Jose Garcia by union members, not discrimination on the basis of sex. See Ex. C at 2. While there are sporadic, unfounded references to various acts of discrimination on the basis of gender, the focus of the Tredinnick

-9-

Report is an "investigation" of the actions of a non-party employee who has not been implicated

in the alleged discrimination in the case at bar. Accordingly, the Tredinnick Report is irrelevant

to the claims asserted by Plaintiffs in the instant matter and thus is inadmissible.

> **C.     Evidence Regarding the Tredinnick Report is More Prejudicial Than
> Probative, Particularly Given The Fact That The Report Consists Only
> Of Unsubstantiated Allegations Unrelated To The Case At Bar.**

Even if the Court determines that the Tredinnick Report is somehow relevant to the issues

raised in this matter, the prejudicial impact of the report far outweighs the probative value.

Federal Rule of Evidence 403 provides that "evidence may be excluded if its probative

value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury, or by consideration of undue delay, waste of time, or needless presentation

of cumulative evidence." Fed. R. Evid. 403.

In a case similar to the present action, an employee alleged discrimination by her

employer on the basis of sex. Rauh, 744 F. Supp. at 1183. The employee sought, however, to

introduce categories of evidence alleging discrimination against employees and customers on the

basis of race. Id. The employer filed a motion in limine arguing that the evidence of race

discrimination was not relevant to the employee's allegations of sex discrimination. Id. In

finding the proposed "evidence" inadmissible, the District Court wrote:

> [t]here is little reason in common experience to infer that an employer
> who discriminates against blacks in his employment decisions is also
> likely to discriminate against women. . . In view of the weak correlation
> between the two types of discrimination, the proposed evidence against
> black employees would be likely to be of little probative value but it
> would have very great potential for prejudice.

Id.

In this case, the allegations contained in the Tredinnick Report are unfounded, have never

been substantiated and have nothing to do with Plaintiffs' claims. Such allegations will only

-10-

mislead the jury or confuse the issues by introducing testimony or documents to suggest that the

unsubstantiated allegations contained in the Report validate Plaintiffs' allegations. <u>See</u>

<u>Morehouse v. Boeing Company</u>, 501 F. Supp. 390 (E.D. Pa. 1980), <u>affirmed without opinion</u>,

639 F.2d 774 (3rd Cir. 1980).

     Additionally, and as explained in <u>Rauh</u>, Defendants here should not have to defend

against the myriad and disparate allegations contained in the Report, particularly since they are

completely unrelated to the claims raised in this lawsuit. A jury may believe that the allegations

contained in the Report demonstrate more likely than not that the Plaintiffs were victims of

harassment and discrimination, not based upon relevant evidence of Plaintiffs' alleged

harassment or on the truth of the allegations contained in the Report, but rather based on the

mere existence of said allegations and the cumulative effect their existence has upon Plaintiffs'

allegations.

     The introduction of this type of testimony or documents can only confuse the issues,

which will unfairly prejudice the Defendants. Plaintiffs cannot be allowed to use this purported

evidence to buttress their own claims of discrimination by assembling a "parade of witnesses"

about unrelated claims by County or Prison employees who are not part of this case. This Court

therefore should preclude the introduction of evidence with regard to the Tredinnick Report.

    **D.**    **The Tredinnick Report Is Replete With Inadmissible Hearsay Testimony**
           **And Should Be Excluded.**

     The Tredinnick Report's references to alleged statements clearly constitute inadmissible

hearsay. Rule 801(c) of the Federal Rules of Evidence defines "hearsay" as:

> [A] statement, other than one made by the declarant while
> testifying at the trial or hearing, offered in evidence to prove the
> truth of the matter asserted.

Fed. R. Evid. 801(c).

Specifically, "testimony of the results of investigations made by other persons, offered as proof of the facts asserted out of court, are properly classed as hearsay." McCormick on Evidence, Section 249, p. 735 (Cleary Rev., 3rd ed. 1984). Here, the alleged statements were made out-of-court and are offered to prove the truth of the matter asserted -- that the allegations contained in the Tredinnick Report are true. See Oaks, 2002 U.S. Dist. LEXIS 12151, at *22 ("[a]s a threshold matter, given the multiple levels of hearsay contained in the task force report, its admissibility is questionable at best").

The Report's hearsay testimony is pervasive and rampant. For example:

- [John Doe 1][6], the rear neighbor of [John Doe 2] has reported a lot of activity at the house. See Ex. C, at 6, 2.1.

- It is reported that [John Doe 3] provided a supervisor from New Jersey with derogatory information. See Ex. C, at 9, ¶ 2.9.

- He was informed by [John Doe 4] that the mother was going to sue. See Ex. C, at 13, ¶ 2.12.

- He advised that [John Doe 5] "lied through his teeth" to [John Doe 6]. See Ex. C, at 13, ¶ 2.13.

As is obvious from these examples, unsubstantiated statements made by individuals regarding other individuals are presented as fact, without corroborating evidence. This is classic hearsay, and the Tredinnick Report must be excluded as inadmissible under Federal Rule of Evidence 801(c).

### E.    Documents From <u>Doe</u> Are Irrelevant and More Prejudicial Than Probative to This Action.

The <u>Doe</u> matter involved, for the most part, claims of racial discrimination and denial of medical treatment, neither of which any bearing upon claims of gender discrimination. See

---

[6] All individuals referenced by the Tredinnick Report will be identified as "John Doe" for purposes of maintaining the confidential nature of the Report.

946910v1

discussion, supra, at 7-9. As noted in the case law above, evidence of one form of discrimination is irrelevant and highly prejudicial to prove another form of discrimination. See Oaks, 2002 U.S. Dist. LEXIS 4907, at *21; Simonetti, 2000 U.S. Dist. LEXIS 11407, at *16-17; Rauh, 744 F. Supp. at 1183. The Doe file, therefore, is inadmissible in the present action.

Furthermore, it is significant that it was not revealed to Defendants until after the close of discovery that Plaintiffs intended to rely upon documents from the Doe file to support their claims. In light of the fact that the Doe matter involved the exchange of thousands of documents, this clearly is unfairly prejudicial to Defendants, who did not have the opportunity to cross-examine Plaintiffs on the Doe matter, or conduct any other discovery regarding the relevance of Doe. For these reasons, as well as those articulated supra, the Doe file must be precluded from admission into evidence at trial.

## III.    **CONCLUSION**

Accordingly, Defendants respectfully request that this Court enter an Order precluding the admission of introducing evidence regarding the Tredinnick Report and documents related thereto.

Linda M. Martin, Esquire
John R. Bielski, Esquire
Willig, Williams & Davidson
1845 Walnut Street
24th Floor
Philadelphia, PA  19103
(215) 656-3600

Attorneys for Defendant,
AFSCME Local 2549

Dated:  August 11, 2003

David J. MacMain, Esquire
L. Kristen Blanchard, Esquire
Dennis G. Young, Jr., Esquire
Montgomery, McCracken, Walker & Rhoads, LLP
123 South Broad Street
Philadelphia, PA  19109
(215) 772-1500

Attorneys for Defendants,
Northampton County, Northampton County,
Department of Corrections, and Todd Buskirk

Dated:  August 11, 2003

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of August, 2003, I caused a true and correct copy of the foregoing **Defendants Joint Motion in Limine of All Defendants To Preclude the Admission of Testimony Regarding the Tredinnick Report and Documents Related Thereto, With Amended Exhibits, and Brief in Support Thereof** to be served upon counsel for Plaintiffs by First Class Mail, Postage Prepaid, addressed as follows:

Anne P. Felker, Esquire
539 Center Street
P.O. Box 190
Bethlehem, PA  18016-0190

Jordan Yeager, Esquire
Boockvar & Yeager
714 Main Street
Bethlehem, PA  18017

Robert L. Sharpe, Jr. Esquire
328 West Broad Street
Quakertown, PA  18951

*Attorneys for Plaintiffs,*
*Susanne H. Linn and Melissa Knesz*


/L. Kristen Blanchard

946910v1

# EXHIBIT A



## IN THE UNITED STATES DISTRICT COURT
## FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

SUSANNE H. LINN and MELISSA KNESZ,    :
                                      :
            PLAINTIFFS,               :    No. 02-4417
                                      :
VS.                                   :
                                      :
NORTHAMPTON COUNTY,                   :
NORTHAMPTON COUNTY DEPARTMENT         :
OF CORRECTIONS, TODD BUSKIRK,         :
WARDEN, AFSCME LOCAL 2549,            :
                                      :    JURY TRIAL DEMANDED
            DEFENDANTS                :


## FIRST AMENDED COMPLAINT

### NATURE OF PROCEEDING

This is an action seeking redress for illegal gender discrimination, retaliation and

deprivation of constitutional and contractual rights brought by Susanne H. Linn and Melissa

Knesz against their employer, Northampton County Department of Corrections, Warden Todd

Buskirk and their union, AFSME Local 2549. Plaintiffs also set forth pendent state claims under

comparable law of the Commonwealth of Pennsylvania. Plaintiffs seeks legal and equitable

relief.


### JURISDICTION AND VENUE

1.    This action is authorized by and brought under Title VII of the Civil Rights Act of

- 1 -

1962, 42 USC §§ 2000e *et seq.*, the Public Employe Relations Act, 43 P.S. §§ 1101.201 *et seq.*

and the Pennsylvania Human Relations Act, 43 P.S. §§ 951 *et seq..* The jurisdiction of this court

is conferred by 42 USC §2000e-5(f), 28 USC §§ 1331, 1337, 1343(3), 2201 and 2202. Venue is

established by 28 U.S.C. §1391. The Plaintiff also brings pendent state claims under the Public

Employe Relations Act, 43 P.S. §§ 1101.201 *et seq.* and the Pennsylvania Human Relations Act,

43 P.S. §951 *et seq.,* and invokes the jurisdiction of this court pursuant to Rule 18(a) of the

Federal Rules of Civil Procedure to hear and adjudicate such state claims as a plaintiff may have

against the opposing party.

      2.     The acts complained of herein took place in the Eastern District of Pennsylvania.

      3.     Plaintiffs exhausted their administrative remedies with the Equal Employment

Opportunity Commission and the Pennsylvania Human Relations Commission.

**PARTIES**

      4.     Plaintiff Susanne H. Linn is an adult individual residing at 312 Mickley Street,

Whitehall, Lehigh County, Pennsylvania; Plaintiff Melissa Knesz is an adult individual residing

at 513 Oakwood Street, Easton, Northampton County, Pennsylvania.

      5.     Defendants herein are Northampton County, its Department of Corrections, and

Todd Buskirk, Warden, all with a business address of 666 Walnut Street, Easton, Northampton

County, Pennsylvania, and American Federation of State County and Municipal Employees,

Local 2549, with a business address of 400 Washington Street, Suite 1200, Reading, Berks

County, Pennsylvania. All plaintiffs worked for Defendant Northampton County and the

Department of Corrections, in the course of which all were represented by Defendant AFSCME Local 2549. Plaintiff Linn began her employment on June 23, 1992; Plaintiff Melissa Knesz began her employment on April 17, 1998.

**CLAIMS**

**COUNT I**
**Plaintiffs v. All Defendants**
**TITLE VII -- DISCRIMINATION**

6. Paragraphs one through five are incorporated herein as if fully set forth below.

7. Throughout the course of their employment with Northampton County, plaintiffs worked as corrections officers in Northampton County Department of Corrections, at the Prison facility located at 666 Walnut Street, Easton, Northampton County, Pennsylvania.

8. Throughout the course of their employment with Northampton County, plaintiffs performed their job duties well.

9. In the course of their employment with Northampton County and their representation by AFSCME Local 2549, plaintiffs have been subjected to differential, and more difficult and dangerous working conditions and treatment because of their gender

10. Conditions for female inmates at Northampton County Department of Corrections are inferior to those for male inmates; plaintiffs and all other female corrections officers forced to work primarily in the female quarters are subjected to more difficult and dangerous working conditions than their male counterparts.

11. Plaintiffs, like all other female officers, were provided only limited job opportunity, in both

- 3 -

daily job assignments and chance for promotion, compared to that available for similarly situated male corrections officers.

12. Plaintiffs, like other female corrections officers, were actively discouraged from pursuing any higher level positions. They observed less senior, less qualified male officer getting promoted over more senior, more qualified female officers.

13. Plaintiffs, like all other female officers, have had Defendant AFSCME refuse to process grievances, on account of their gender.

14. The defendants' treatment of female corrections officers comprised and continues to this day to comprise unlawful and discriminatory practices under Title VII.

15. Said practices were in place throughout the tenure of plaintiffs' employment, and continue to the present.

16. On or about March 29, 2001, Plaintiff Linn timely filed her charge of employment discrimination on the basis of her sex with the Equal Employment Opportunity Commission, cross-filed with the Pennsylvania Human Relations Commission, at charge number 170A200901. By letter dated April 3, 2002, Linn was notified by the US EEOC of her right to initiate a civil action in the appropriate federal court within 90 days of receipt of that letter. This action was filed within 90 days of plaintiffs' receipt of the "right to sue" letters, copies of which is attached hereto and incorporated herein as Exhibit A.

17. On or about March 29, 2001, Plaintiff Knesz timely filed her charge of employment discrimination on the basis of her sex with the Equal Employment Opportunity Commission, cross-filed with the Pennsylvania Human Relations Commission, at charge number 170A200899. By

- 4 -

letter dated April 3, 2002, Knesz was notified by the US EEOC of her right to initiate a civil action in the appropriate federal court within 90 days of receipt of that letter. This action was filed within 90 days of plaintiffs' receipt of the "right to sue" letters, copies of which is attached hereto and incorporated herein as Exhibit B.

18.  As a result of the discriminatory conduct of defendants, plaintiffs have suffered and continue to suffer damages.

WHEREFORE, plaintiffs respectfully request that this Court:

a)     adjudge and decree that Defendants have violated Title VII;

b)     grant plaintiffs a permanent injunction prohibiting Defendants from engaging in any employment acts, policies, practices or procedures which may discriminate against plaintiffs on the basis of their gender;

c)   order Defendants to pay damages to plaintiffs for lost past and future wages resulting from the discriminatory treatment described above;

d)     order Defendants to reimburse plaintiffs for all other employment benefits lost as a result of the discriminatory policies and practices of the defendants, including but not limited to back pay and front pay with prejudgment interest, lost health benefits, lost pension contributions, and lost future earning capacity, in amounts to be proven at trial;

e)     award plaintiffs compensatory damages for emotional distress suffered as a result of Defendants' discriminatory treatment;

f)     award plaintiffs punitive damages in an appropriate amount;

g)     award plaintiffs the costs of this action, together with reasonable attorneys ' fees; and,

h)    grant plaintiffs such additional equitable and legal relief as is just and proper.

## COUNT II
### Plaintiffs vs. All Defendants
### TITLE VII -- HOSTILE WORK ENVIRONMENT

19. Paragraphs six through eighteen are incorporated herein a if fully set forth below.

20.    Throughout the course of their employment, plaintiffs have been subjected to a work environment that is hostile to them on account of their gender. Characteristics of this environment include, but are not limited to, having female employees who made complaints of sexual harassment ignored or actively retaliated against by all levels of management and many union officials; having management and union officials unresponsive to female employees ongoing complaints of differential treatment, and being kept out of negotiations regarding grievances nominally filed on plaintiffs' own behalf.

21. The treatment complained of herein was both carried out and tolerated by the highest levels of management of both the Prison and the Union, up to and including Warden Todd Buskirk and Union President Alfred Crivellero.

22. By their leadership and condonation of discriminatory treatment of female corrections officers, defendants created an atmosphere encouraging individual harassment of women on account of their gender.

23. The defendants created and permitted to continue a work environment that was hostile to women on account of their gender.

24. Women corrections officers who complained about discrimination were given more difficult work and even more limited opportunity than women corrections officers who quietly tolerated

discriminatory treatment.

25. The harassment endured by plaintiffs was severe and pervasive, such that the terms and conditions of their and all other female corrections officers' employment was affected.

26. As a result of being subjected to a hostile environment, plaintiffs suffered and continue to suffer damages.

WHEREFORE, plaintiffs respectfully request that this Court:

a)    adjudge and decree that Defendants have violated Title VII;

b)    grant plaintiffs a permanent injunction prohibiting Defendants from engaging in any employment acts, policies, practices or procedures which may discriminate against plaintiffs on the basis of their gender;

c)  order Defendants to pay damages to plaintiffs for lost past and future wages resulting from the discriminatory treatment described above;

d)    order Defendants to reimburse plaintiffs for all other employment benefits lost as a result of the discriminatory policies and practices of the defendants, including but not limited to back pay and front pay with prejudgment interest, lost health benefits, lost pension contributions, and lost future earning capacity, in amounts to be proven at trial;

e)    award plaintiffs compensatory damages for emotional distress suffered as a result of Defendants' discriminatory treatment;

f)    award plaintiffs punitive damages in an appropriate amount;

g)    award plaintiffs the costs of this action, together with reasonable attorneys' fees; and,

h)    grant plaintiffs such additional equitable and legal relief as is just and proper.

- 7 -

## COUNT III
### Plaintiffs vs. All Defendants
### TITLE VII -- RETALIATION

27. Paragraphs nineteen through twenty six are incorporated herein as if fully set forth below.

28. Plaintiffs and all other women corrections officers who complained about discrimination were given more difficult work and even more limited opportunity than women corrections officers who quietly tolerated discriminatory treatment.

29. Defendants so treated plaintiffs with malice and indifference to plaintiffs' federally protected rights.

30. As a result of defendants' actions, plaintiffs suffered and continue to suffer damages.

WHEREFORE, plaintiffs respectfully request that this Court:

a)      adjudge and decree that Defendants have violated Title VII;

b)      grant plaintiffs a permanent injunction prohibiting Defendants from engaging in any employment acts, policies, practices or procedures which may discriminate against plaintiffs on the basis of their gender;

c) order Defendants to pay damages to plaintiffs for lost past and future wages resulting from the discriminatory treatment described above;

d)      order Defendants to reimburse plaintiffs for all other employment benefits lost as a result of the discriminatory policies and practices of the defendants, including but not limited to back pay and front pay with prejudgment interest, lost health benefits, lost pension contributions, and lost future earning capacity, in amounts to be proven at trial;

- 8 -

e)      award plaintiffs compensatory damages for emotional distress suffered as a result of Defendants' discriminatory treatment;

f)      award plaintiffs punitive damages in an appropriate amount;

g)      award plaintiffs the costs of this action, together with reasonable attorneys ' fees; and,

h)      grant plaintiffs such additional equitable and legal relief as is just and proper.

## COUNT IV
### Plaintiffs v. Northampton County, Department
### of Corrections and Todd Buskirk
### 42 USC § 1983 -- EQUAL PROTECTION

31. Paragraphs twenty-seven through thirty are incorporated herein as if fully set forth below.

32. Under the Equal Protection Clause of the United States Constitution, plaintiffs are entitled to the same treatment in their employment as their male co-workers.

33. Defendants Northampton County, Department of Corrections and Todd Buskirk  have a custom or practice of permitting female employees to be discriminated against in the terms and conditions of their employment, in violation of the Equal Protection Clause of the United States Constitution, as well as of federal statutes prohibiting gender discrimination.

34. At all times relevant, defendants acted under color of state law and with a reckless or callous disregard of, or indifference to, the rights and safety of plaintiff and other women similarly situated.

35. As a result of the customs or practices described in paragraph thirty three plaintiffs incurred substantial property loss and other damages.

WHEREFORE, plaintiffs respectfully  request that this Court:

a)      adjudge and decree that defendants have violated the United States Constitution and 42 USC § 1983;

b)      grant plaintiffs a permanent injunction prohibiting defendants from engaging in any employment acts, policies, practices or procedures which may violate the United States Constitution;

c)      order defendants to compensate plaintiffs for wages and other employment benefits lost as a result of the unconstitutional policies and practices of the defendants, including but not limited to back pay and front pay with prejudgment interest, lost health benefits, lost pension contributions, and lost future earning capacity, in amounts to be proven at trial;

d)      award plaintiffs compensatory damages for emotional distress suffered as a result of defendants' unconstitutional treatment;

e)      award plaintiffs punitive damages in an appropriate amount;

f)      award plaintiffs the costs of this action, together with reasonable attorneys ' fees; and,

g)      grant plaintiffs such additional equitable and legal relief as is just and proper.


## COUNT V
### Plaintiffs vs. Northampton County, Department of Corrections and Todd Buskirk
### 42 USC § 1983 -- FIRST AMENDMENT

36. Paragraphs thirty one through thirty five are incorporated herein as if fully set forth below.

37. Under the First Amendment to the United States Constitution, plaintiffs are entitled to speak freely regarding their employment.

38. Defendants have a custom or practice of retaliating against female employees who speak out against discrimination they and other female corrections officers are subjected to in the course of their employment with the Northampton County Department of Corrections.

39. At all times relevant, defendants acted under color of state law and with a reckless or callous

- 10 -

disregard of, or indifference to, the rights and safety of plaintiff and other women similarly situated.

40.  As a result of the customs or practices described in paragraph fifty-two, plaintiffs incurred substantial property loss and other damages.

WHEREFORE, plaintiffs respectfully pray that this Court:

a)     adjudge and decree that defendants have violated the United States Constitution and 42 USC § 1983;

b)     grant plaintiffs a permanent injunction prohibiting defendants from engaging in any employment acts, policies, practices or procedures which may violate the United States Constitution;

c)     order defendants to compensate plaintiffs for wages and other employment benefits lost as a result of the unconstitutional policies and practices of the defendants, including but not limited to back pay and front pay with prejudgment interest, lost health benefits, lost pension contributions, and lost future earning capacity, in amounts to be proven at trial;

d)     award plaintiffs compensatory damages for emotional distress suffered as a result of defendants' unconstitutional treatment;

e)     award plaintiffs punitive damages in an appropriate amount;

f)     award plaintiffs the costs of this action, together with reasonable attorneys ' fees; and,

g)     grant plaintiffs such additional equitable and legal relief as is just and proper.

### COUNT VI
### Plaintiffs v. AFSCME Local 2549
### BREACH OF DUTY OF FAIR REPRESENTATION

41.  Paragraphs thirty six through forty are incorporated herein as if fully set forth below.

42.  For years, the Defendant AFSCME Local 2549 has failed and refused to fairly represent the

interests of plaintiffs in grievance proceedings, contract negotiation and enforcement.

43. Defendant has failed to press or only perfunctorily pressed individual claims raised by plaintiffs.

44. Pursuit of administrative remedy for this claim would be futile as a matter of law.

45. Defendant AFSCME Local 2549 has colluded with the employer to deprive plaintiffs of unbiased treatment in the workplace.

46. As a result of Defendants actions cited above, plaintiffs have suffered and continue to suffer damages.

WHEREFORE, plaintiffs respectfully request that this Court:

a)    adjudge and decree that Defendants have violated all federal and state statutory and common law that require a labor organization to fairly represent its members;

b)    grant plaintiffs a permanent injunction prohibiting Defendants from engaging in any employment acts, policies, practices or procedures which may discriminate against plaintiffs on the basis of their gender;

c)    order Defendants to pay damages to plaintiffs for lost past and future wages resulting from the discriminatory treatment described above;

d)    order Defendants to reimburse plaintiffs for all other employment benefits lost as a result of the discriminatory policies and practices of the defendants, including but not limited to back pay and front pay with prejudgment interest, lost health benefits, lost pension contributions, and lost future earning capacity, in amounts to be proven at trial;

e)    award plaintiffs compensatory damages for emotional distress suffered as a result of Defendants' discriminatory treatment;

- 12 -

f)      award plaintiffs punitive damages in an appropriate amount;

g)      award plaintiffs the costs of this action, together with reasonable attorneys ' fees; and,

h)      grant plaintiffs such additional equitable and legal relief as is just and proper.

## COUNT VII
### Plaintiffs v. All Defendants
### PENNSYLVANIA HUMAN RELATION ACT

47.  Paragraphs forty one through forty six are incorporated herein as if fully set forth below.

48.  Plaintiffs cross filed their administrative complaint with the Pennsylvania Human Relations

Commission.

49.  The actions of defendants violate the proscriptions of the Pennsylvania Human Relations Act

against discrimination on the basis of gender  and retaliation.

WHEREFORE, plaintiffs respectfully  requests that this Court:

a)      adjudge and decree that Defendants have violated the Pennsylvania Human Relations Act,

43 PS §§ 951 *et seq.*;

b)      grant Plaintiff a permanent injunction prohibiting Defendants from engaging in any

employment acts, policies, practices or procedures which may discriminate or retaliate against

Plaintiff on the basis of her gender;

c)    order Defendants to reinstate Plaintiff to her last held position, or in the alternative, to pay

damages for lost future wages;

d)      order Defendants to reimburse Plaintiff for wages and other employment benefits lost as a

result of the discriminatory and retaliatory  policies and practices of the defendants, including but

not limited to back pay and front pay with prejudgment interest, lost health benefits,  lost pension

contributions, and lost future earning capacity, in amounts to be proven at trial;

e)    award Plaintiff compensatory damages for emotional distress suffered as a result of

Defendants' discriminatory and retaliatory treatment;

f)    award Plaintiff punitive damages in an appropriate amount;

g)    award Plaintiff the costs of this action, together with reasonable attorneys ' fees; and,

h)    grant Plaintiff such additional equitable and legal relief as is just and proper.


**A Jury Trial is demanded.**

Respectfully submitted,

BY: _____

Anne P. Felker, Attorney for
Plaintiffs
Attorney I.D. # 36810
539 Center Street
P.O. Box 190
Bethlehem, PA 18016-0190
Telephone: (610)861-7737
Facsimile: (610)861-9460


BY: _____

Jordan Yeager, Attorney for Plaintiffs
Boockvar & Yeager
Attorney ID # 72947
714 Main Street
Bethlehem, PA   18017
Telephone:(610)861-4662
Facsimile: (610)861-4665

# NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

To: Melissa Knesz
    1202 Bushkill Street
    Easton, PA 18042-3227

From: Equal Employment Opportunity Commission
Philadelphia District Office
The Bourse
21 S. Fifth Street, Suite 400
Philadelphia, PA 19106-2515

[ ]  [ ]   *On behalf of person(s) aggrieved whose identity is*
          *CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 170A200899 | Stanford Lamb, Investigator | 215-440-2617 |

(See also the additional information attached to this fo

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ X ]    More than 180 days have passed since the filing of this charge.

[ ]    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be to complete its administrative processing within 180 days from the filing of the charge.

[ X ]    The EEOC is terminating its processing of this charge.

[ ]    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 da after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ]    The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be **filed in federal or state court WITHIN DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]    The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, y may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*                                    *April 3, 2002*

Marie M. Tomasso, District Director              *(Date Mailed)*

Enclosure(s)

Information Sheet

cc:    A.F.S.C.M.E. - Local 2549
       Anne P. Felker, Esquire (for Charging Party)

EXHIBIT B

To: Susanne H. Linn
312 Mickley Street
Whitehall, PA 18052-6210

From: Equal Employment Opportunity Commission
Philadelphia District Office
The Bourse
21 S. Fifth Street, Suite 400
Philadelphia, PA 19106-2515

[ ] On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 170A200901 | Stanford Lamb, Investigator | 215-440-2617 |

(See also the additional information attached to this fo

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA **must be in federal or state court WITHIN 90 DAYS of your receipt of this Notice.** Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ X ]   More than 180 days have passed since the filing of this charge.

[ ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be to complete its administrative processing within 180 days from the filing of the charge.

[ X ]   The EEOC is terminating its processing of this charge.

[ ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 da after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN** __ **DAYS of your receipt of this Notice.** Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, y may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_Marie M. Tomasso,_ District Director

April 3, 2002

*(Date Mailed)*

Enclosure(s)
    Information Sheet
cc:   A.F.S.C.M.E. - Local 2549
    Anne P. Felker, Esquire (for Charging Party)

EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

SUSANNE H. LINN and MELISSA KNESZ,    :
                                         :

               PLAINTIFFS,     :   No. 02-4417
                                         :

VS.                                :
                                       :

NORTHAMPTON COUNTY,           :
NORTHAMPTON COUNTY DEPARTMENT  :
OF CORRECTIONS, TODD BUSKIRK,   :
WARDEN, AFSCME LOCAL 2549,     :
                                       :   JURY TRIAL DEMANDED

              DEFENDANTS     :

CERTIFICATE OF SERVICE

     I, Anne P. Felker, certify that on this 4th day of December, 2002, I served a true and correct copy of the First Amended Complaint, via first class mail, postage prepaid, on the following:

               L. Kristen Blanchard, Esq.
               Montgomery, McCracken, Walker & Rhoads, LLP
               123 South Broad Street
               Philadelphia, PA  19109

               Amy L. Rosenberger, Esq.
               Willig, Williams & Davidson
               Twenty-Fourth Floor
               1845 Walnut Street
               Philadelphia, PA  19103

               Respectfully submitted,

               _____
               Anne P. Felker, Counsel for Plaintiffs

# EXHIBIT B

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

CASE NUMBER
170A200899

☐ FEPA
☒ EEOC

## Pennsylvania Human Relations Commission

*State or local Agency, if any*

and EEOC

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Melissa Knesz | 610-515-1806 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1202 Bushkill St., Easton, PA 18042 | | 4/21/67 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| Northampton Co. Prison | more than 200 | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 666 Walnut St., Easton, PA 18042 | | Northampton |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| AFSCME Local 2549 | 610-372-4601 |

| STREET ADDRESS (District Off.) | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 400 Washington St., Suite 1200, Reading, PA 19601 | | Berks |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ AGE
☒ RETALIATION ☐ NATIONAL ORIGIN ☐ DISABILITY ☐ OTHER (Specify)

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)        LATEST (ALL)

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

   See attached

| | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| Date 4/16/01   [signature] Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

EEOC FORM 5 (Test 10/94)

AFSCME 0032

MELISSA KNESZ

I began working for Northampton County Prison as a Corrections Officer on April 17, 1998; I remain in the same position. Throughout the time I worked at the Prison, I have been subjected to differential treatment because I am a woman. It would be impossible for me to list all of the incidents of differential treatment, but some of them are as follows:

I, like all other female corrections officers, am subject to a Prison policy that limits me to working in the women's quarters unless there are a certain minimum number of female officers on duty. Because the number of women hired by the Prison is kept very low, this means I am almost always required to work in the women's quarters. Although male CO's could do all other duties among female inmates, they are not expected to work in female quarters, while we women are expected to work in both the female and male units.

I, like all the other women, am denied advancement, or even opportunity for advancement. Women are expressly discouraged from trying for other jobs, being told we are to be in women's quarters only. For example, on February 22, 2001, one of the Lieutenants announced that he would be letting CO's put in for different post assignments, and that "anyone interested" should let him know. When another female CO stated that she was interested in two posts in the men's quarters, the Lieutenant responded to the effect that "females only hold female posts." Then on March 1, 2001, that same Lieutenant announced that all the positions had been filled; no females got posts, even though the females, including me, have more seniority than the male CO's who got posts.

Our ability to take vacation and other days off is severely limited, compared to the male CO's. Our overtime choices are more limited. While me can leave their shifts early and leave

1

AFSCME 0033

sometimes in the middle of their shifts, women cannot. For example, in the Autumn of 2000, I had an emergency at my house cause by a cracked pipe. I was not allowed to go home immediately, as a man would have been. When I explained that I needed to deal with a plumbing problem, one of the Lieutenants said to me, "doesn't your husband know how to do it."

The Union does not represent my interests, or those of the other women CO's. Women CO's have to be prepared and able to do everything on the male side, while the male CO's are not required to work with female inmates at all. The union has been asked to deal with this, but lets it go on. The union takes only enough action for the women CO's to keep from taking any other action, and when it comes right down to it, they have always chosen to represent the interests of the male CO's at the expense of us female CO's. When they know there is no way around having to take up a grievance, they have sold us out to the administration. Most recently, when we gave a joint letter of complaint to the administration about the conditions of female officers (last month), the Union took the side of the Prison.

On March 18, 2001, when I indicated that I was not interested in selling Union raffle tickets, like I had last year, a member of the Union's Executive Board threatened to sacrifice the pending grievance concerning the treatment of women CO's stating, "You know you have an arbitration hearing coming up."

I am also discriminated against in that the conditions in the women's quarters are more difficult than in the men's quarters. The facilities for female inmates are far less adequate than what is provided to the male inmates. As only one example, there is inadequate space for an infectious female inmate to be quarantined, and thus I am exposed to greater health risks than if I were permitted to work in the male quarters, where infectious inmates are kept under quarantine

2

AFSCME 0034

if necessary. Because the women's quarters has multiple units all together, we can have an inmate who's supposed to be in protective segregation across the hall from an inmate she's testifying against. Inmates can talk to other inmates who are supposed to be in lock-up. Thus, my job as a corrections officer is more difficult and risky in the women's quarters.

There's retaliation and retribution when any of us complain about being unfairly treated. For example, on March 20, 2001, I asked when an empty "female" position -- which has been open for two years – would be filled. Lieutenant Beers stated that management will not do anything for the females "because of arbitration, your grievance and your lawsuit."

I am also subjected to a sexually hostile work environment. When another female CO filed sexual harassment charges against a co-worker, he got off with next to nothing, and even that was only after she pushed to get something done. The administration didn't do anything to help the female CO, and she ended up having to leave. We all know that if we have a problem, we cannot expect the administration and our Union to do anything to help us. We are also regularly subjected to abusive and sexual language, such as being called "bitch", "cunts" by supervisors, co-workers and union officials.

4/16/01
Date

MELISSA KNESZ

3

AFSCME 0035

# CHARGE OF DISCRIMINATION

CRITICAL

This form is affected by the Privacy Act of 1974; see Privacy Act statement before completing this form.

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| | x EEOC | 170A200901 |

**Pennsylvania Human Relations Commission** and EEOC

*State or local Agency, if any*

NAME (Indicate Mr. (Ms.) Mrs.)
Susanne Linn

HOME TELEPHONE (Include Area Code)
(610) 433-3431

STREET ADDRESS
312 Mickley Rd.

CITY, STATE AND ZIP CODE
Whitehall PA 18052

DATE OF BIRTH
12/19/46

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

NAME
Northampton County Prison

NUMBER OF EMPLOYEES, MEMBERS
more than 200

TELEPHONE (Include Area Code)
610 559-3229

STREET ADDRESS
666 Walnut Street

CITY, STATE AND ZIP CODE
Easton PA 18042

COUNTY
Northampton

NAME
AFSCME Local 2549

TELEPHONE NUMBER (Include Area Code)
610 372 4601

STREET ADDRESS (District Office)
400 Washington St, Suite 1200,

CITY, STATE AND ZIP CODE
Reading, PA 19601

COUNTY
BERKS

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

| [ ] RACE | [ ] COLOR | [✓] SEX | [ ] RELIGION | [ ] AGE |
|---|---|---|---|---|
| [✓] RETALIATION | [ ] NATIONAL ORIGIN | | [ ] DISABILITY | [ ] OTHER (Specify) |

DATE DISCRIMINATION TOOK PLACE
EARLIEST (ADEA/EPA)     LATEST (ALL)

[✓] CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s).)

See attached (two pages).

RECEIVED EEOC
PHILADELPHIA D.O.
01 APR -2 PH 3: 11

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)

Date 3/28/01    *Susanne H. Linn*
Charging Party (Signature)

EEOC FORM 5 (Test 10/94)

AFSCME 0026

Sue Linn

     I have been working as a Corrections Officer at Northampton County Prison since June 23, 1992. I remain in the position of Corrections Officer. For the most part, I work in the female work release facility, on night shift.

     I, like all other women CO's in Northampton County Prison, am subjected to an ongoing course of discrimination in the way I am treated in my job, and in the lack of job opportunity available to me. Because the Prison hires so few women, those of us who do work there can do little more than fulfill the basic requirements for female officers -- staffing women's quarters and women's work release so that strip searches and urine specimens of female inmates can be handled by women CO's. Although male CO's could do all other duties among female inmates, they are not allowed to work alone in female quarters, while we women are required to work alone in both the female and male units.

     I and other women CO's are denied any genuine opportunity for advancement. Even if we could get supervisory positions, the administration has made very clear that women CO's are not welcome at the Prison, in the way we are regularly undermined and set up by the administration and by our Union as well. At times, we are also required to work overtime at a really burdensome rate, and typically, our ability to take vacation and other days off is severely limited, compared to the male CO's.

     I am also discriminated against in that the female inmates have less opportunity and services than the male inmates, and this carries over to those of us who must work with the female population more often than not. The female work release unit is less secure than the male work release facility, thus subjecting us women CO's who work there to greater risk. We also have more burdens than the male CO's in their work release, in that we women CO's cannot take lunch without taking our female inmates with us.

     I and other female CO's are regularly referred to by offensive terms, such as "bitch", "cunt" and the like, by male supervisors, union officials, and male-coworkers. Male inmates also refer to female CO's with profanity, with the knowledge and apparent consent of the prison management. We know that we will not be backed up by the administration in conflicts with inmates, and this puts us in a very risky situation -- much more than the male CO, who can expect to have his disciplinary actions against inmates backed up. We are treated so badly by the administration and the union that inmates likely see us as easy targets.

     I have been and continue to be deeply affected by the treatment I receive in my employment at Northampton County Prison. In 1994, I filed with the EEOC, but became discouraged when nothing changed. Now, too, we are being retaliated against, having both the Prison and our union tell us we are in trouble for filing a joint letter of complaint last month. I know we are facing more strict discipline ourselves and an even greater narrowing of job opportunity in order to intimidate us since we submitted our letter.

3/28/01
date

Susanne H. Linn
Susanne H. Linn

AFSCME 0027

This statement is intended to accompany and supplement the charges of each individual filing a sexual discrimination/retaliation charge against the Northampton County Prison and AFSCME Local 2549. Each claimant, in addition to the specific factual allegations made elsewhere, states as follows:

I have been subjected to a course of discrimination on the basis of gender since I began working for Northampton County Prison, by the Prison, its officials and administration, and by the union that purports to represent me, AFSCME Local 2549. This discrimination includes both being subjected to more difficult terms and conditions of employment than the male corrections officers, and being subjected to a hostile work environment. This latter ranges from being subjected to female employees being called pejorative terms ("slut" "bitch" "whore" etc.) to seeing the sexual harassment complaints of female employees being pushed aside and ignored, for months if not indefinitely. Our union appears to take on issues only far enough to keep the status quo, to appease us women until the next time it reaches the point where we can't take it any longer. On a day to day basis, our union representatives either do not respond at all to our complaints of gender inequality, or they respond unfavorably.

While we have less opportunity than the male CO's, in terms of varied duties and advancement, it's also true that we are less able to succeed even with such opportunity as we do have, because we work in an environment where the backing of fellow officers and supervisors and administration is essential to safety, and we cannot count on that backing because we are women.

The conditions I work under have affected me in a number of ways -- loss of pay, emotional distress, loss of job satisfaction, lost future wages, to name just a few.

I also have been subjected to retaliation. For example, last month, after a group of us women gave a letter to the Warden specifically complaining about our treatment, and retaliatory discipline against one of the female CO's after we began organizing to bring these charges, the atmosphere at work became more intimidating. The Warden demanded a meeting, the Union insisted we couldn't do this because of a grievance that was pending, and we continue to walk on eggshells. We are being picked out for unfounded discipline as a result of our trying to deal with the discrimination.

These issues I raise on behalf of myself, as well as on behalf of the other women who work at the Prison, some of whom are too intimidated to come forward or just can't file a complaint for other reasons.

*Susanne Linn*
Susanne Linn

# EXHIBIT C

SUSANNE H. LINN and
MELISSA KNESZ,

        Plaintiffs,

       v.

NORTHAMPTON COUNTY,
NORTHAMPTON COUNTY
DEPARTMENT OF CORRECTIONS,
TODD BUSKIRK, WARDEN,
AFSCME LOCAL 2549,

        Defendants.

: Civil Action No. 02-4417
:
:
:
: JURY TRIAL DEMANDED
:
:
:
:
:
:
:

DEFENDANTS' JOINT MOTION IN LIMINE OF ALL DEFENDANTS
TO PRECLUDE THE ADMISSION OF
EVIDENCE REGARDING THE TREDINNICK REPORT
AND UNRELATED LITIGATION

EXHIBIT "C"

# Filed under seal

946916v1

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RECECCA A. MIKLAS,                          :NO: 01-cv-2131

      Plaintiff                              :
                                                         :
                                                         :
                                                         :
    vs.                                            :
                                                         :
NORTHAMPTON COUNTY, et. al.                 :

## NOTICE UNDER LOCAL RULE 7.1(c) & (d)

The above referenced defendants by and through their counsel, David P. Karamessinis,

Esquire of the law firm of Devlin and Devine have filed a Motion for a Protective Order along

with a supporting brief and have served these documents through regular mail upon other parties.

Any reply or opposing memorandum is due within fourteen (14) days of _____ If no

responsive brief is filed within that time period, the Court shall grant defendants' Motion.

DEVLIN & DEVINE

By: _____

David P. Karamessinis, Esquire
Attorney for Defendants

100 West Elm Street, Suite 200
Conshohocken, PA 19428
(610) 397-4635

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RECECCA A. MIKLAS,                    :NO: 01-cv-2131
                                      :
            Plaintiff                 :
                                      :
                                      :
                                      :
      vs.                             :
                                      :
NORTHAMPTON COUNTY, et. al.           :

## ORDER

AND NOW, this    day of    , 2002 upon consideration of defendants' Motion for a Protective Order preventing the release and/or use during discovery or trial of the report prepared by Arthur Tredinick identified as "ROI; M-063-GCL-71," it is hereby ORDERED that the Motion is granted and that the document is protected from disclosure and cannot be used in discovery or at trial of this matter.

BY THE COURT:

_____
                          J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RECECCA A. MIKLAS.                           :NO: 01-cv-2131
                                             :
                Plaintiff                    :
                                             :
                                             :
                                             :
        vs.                                  :
                                             :
NORTHAMPTON COUNTY, et. al.                  :

## MOTION FOR A PROTECTIVE ORDER

Defendants hereby move for a Protective Order to preclude release of the Arthur

Tredinick report and/or prevent the use of the Tredinick report in connection with the above-

captioned matter.  Defendants hereby rely on the attached brief in support.


                                DEVLIN AND DEVINE

                                BY: _____
                                    David P. Karamessinis. Esquire
                                    Attorney for Defendants
                                    100 West Elm Street
                                    Suite 200
                                    Conshohocken, PA  19428
                                    610-397-4635

Date: 4/26/02

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RECECCA A. MIKLAS,                    :NO: 01-cv-2131
                                      :
            Plaintiff                 :
                                      :
                                      :
                                      :
     vs.                              :
                                      :
NORTHAMPTON COUNTY, et. al.           :

DEFENDANT, COUNTY OF NORTHAMPTON, ET AL.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR A PROTECTIVE ORDER

## I.    BACKGROUND

Rebecca Miklas, a former Corrections Officer at the Northampton County Jail,

Northampton County, Pennsylvania filed suit on or about May 1, 2001 contending inter alia, that

she was sexually harassed by a fellow Corrections Officer and that she was discriminated against

by administration of the Northampton County Jail in violation of Title VII. (See Complaint

paragraphs 9 and 17).  Defendants denied the allegations and discovery has commenced.

Plaintiff has sought production of an investigation report which was prepared by ex-State

Police Officer Arthur Tredinick ("Tred. Rpt."), at the request of former Northampton County

Director of Corrections Cynthia Marakovits.

The Tredinick report is a 61 page document in which Arthur Tredinick interviewed over

60 current corrections officers as well as over 20 inmates and ex-inmates and invited such

individuals to air their grievances regarding the manner in which the jail was being run.  The

subjects which arose in the interviews of Corrections Officers concerned a myriad of topics

including everything from questions about the "work release program" applicable to inmates and

differential discipline of inmates, to "leaks" from the jail to the press, and inappropriate

fraternizing among officers.

The Tredinick report also mentions his review of internal jail documents which are not

available to the general public such as formal disciplinary hearings, incident reports with

inmates, logs, etc. The report concludes by chastising the behavior of various employees and noting Tredinick's belief that certain behaviors are contrary to the Code of Ethics of the Northampton County Department of Corrections, Title 37, Chapter 95 of the Pennsylvania Code, and various criminal offenses.

Finally, Tredinick makes numerous recommendations regarding personnel issues and suggested changes in various programs, and changes in the manner in which the jail is run.

II.    ARGUMENT

A.    THE TREDINICK REPORT SHOULD BE PROTECTED FROM DISCLOSURE UNDER THE SELF-CRITICAL ANALYSIS PRIVILEGE

The Tredinick investigative report was requested to be performed by the Director of Corrections. The report covers a wide range of topics and, includes the interview of 60 current corrections officers which interviews find the officers openly critical of various policies and procedures. Since the report contains numerous "recommendations" regarding changes in the way the entire jail is run, the report constitutes a self-critical analysis which should not be disclosed.

The policy behind the self-critical analysis privilege "is based upon the concern that disclosure of documents reflecting candid self-examination will deter or suppress socially useful investigations and evaluations or compliance with the law or with professional standards." Clark v. Mellon Bank, N.A., 1993 WL 170950 (Ed. Pa. 1993)(citing Hardy v. New York News, Inc. 114 F.R.D. 633 (S.D.N.Y. 1987)). "[O]ne of the purposes of the [critical self-analysis] doctrine is to prevent a 'chilling' effect on self-analysis and self-evaluation prepared for the purposes of protecting the public by instituting practices assuring safer operations." Granger v. Nat'l. R.R. Passenger Corp., 116 F.R.D. 507, 509 (E.D. Pa. 1987).

In the Federal District Court for the Eastern District of Pennsylvania, the self-critical analysis privilege generally requires:

2

1.    The materials must have been prepared for mandatory government reports, or for a self-critical analysis undertaken by the parties seeking protection;

2.    The privilege extends only to subjective, evaluative materials, but not to objective data reports; and

3.    The policy favoring exclusion must clearly outweigh plaintiff's need for the documents.

Clark v. Pennsylvania Power and Lights, Co., Inc., 1999 WL 225888 (E.D. Pa. April 14 1999 at p. 2)(emphasis added)(citing Dowling v. American Hawaii Cruises, Inc., 971 F.2d 423, 425-26 (9th Cir. 1992)).

Although in the context of employment discrimination cases the privilege has most typically been applied to reports required to be filed with the government, Webb v. Westinghouse Elec., Corp., 81 F.R.D. 431, 433 (E.D. Pa. 1978), application of the privilege to other documents which satisfy the above cited tests is equally logical. For example, in Clark v. Pennsylvania, the Court noted that:

> self-critical analysis privilege applies equally to equal employment opportunities ("EEO") reports and other studies prepared with the intention and understanding that the report would be kept strictly confidential…

Id. (citations omitted); ASARCO, Inc. v. NLRB, 805 F.2d 194, 199-200 (6th Cir. 1986)(policies for protecting self-critical analysis are sound); Coates v. Johnson and Johnson, 756 F.2d 524, 551-52 (7th Cir. 1985)("prevailing view that self-critical portions of Affirmative Action Plans are privileged and not subject to discovery by plaintiffs.")

In striking a balance between plaintiff's need for information (prong #1 of the test above) and defendant's need to keep self-critical evaluation evidence private, many Courts have required the defendant to turn over the factual data contained in the reports but not evaluative or analytical portions Id. See generally McClain v. Mack Trucks, Inc., 85 F.R.D. 53 (E.D. Pa. 1979); Tice v. American Air Lines, Inc., 192 F.R.D. 27 (N.D. IL. 2000); UPIN v. Metropolitan Life, Inc., Co., 169 F.R.D. 546 (S.D.N.Y. 1996); Jamison v. Storer Broadcasting, Co., 511

3

F.Supp. 1286, 1296-97 (E.D. Mich. 1981); Reid v. Lockheed Martin Aeronautics,Co., 199 F.R.D. 379 (N.D. Ga. 2001).

The Tredinick report contains criticisms of personnel as well as of policies and practices. (See Tred. Rept. attached as Exhibit "A," which is being filed under seal). The interviews of the corrections officers contain, in most instances, their subjective evaluations of certain situations in which they found themselves--whether these opinions concerned altercations with other corrections officers, inmate discipline or perceived ineffectiveness of certain supervisors. The report was clearly intended to be confidential and in fact has been kept confidential and not been released to the public or anyone else since it was first produced by Arthur Tredinick two years ago.[1]

No Corrections Officer would have "bared his soul" in the manner set forth in the Tredinick report had he believed that the information would have gotten out to the public; Furthermore, to disclose such information now would not only cause difficulties not only between Corrections Officers and superiors identified in the report, but would compromise any of the suggestions or recommended changes in the report which might have been useful to the department. That is precisely the concern which underlies this privilege.

Furthermore, defendant has provided all written complaints by any current or former corrections officer concerning sexual discrimination or harassment, and the Tredinick report in no way "conflicts with [Miklas'] ability to gather information necessary to prove her case..." See Webb, 81 F.R.D. at 433. In fact, since plaintiff's counsel represents four other female corrections officers, who, defense counsel understands, are making the same discrimination

---

[1] The report may have been produced in some fashion in the matter of Tuddles v. Buskirk, No. CV-3368 (E.D. 2000)(Brody J.) but counsel is not aware of what constraints have been placed on its case.

claim against Northampton County Jail as made in the <u>Miklas</u> case[2] (except for sexual

harassment), it would appear that plaintiff has all she needs in order to satisfy her <u>prima facie</u>

burden.

B.    **THE TREDINICK REPORT IS NOT SUBJECT TO PRODUCTION
UNDER EITHER THE FREEDOM OF INFORMATION ACT ("FOIA")
OR PENNSYLVANIA'S RIGHT TO KNOW LAW**

Although the Freedom of Information Act ("FOIA") 5 U.S.C. §552 (1988 & Supp. V

1993) was enacted in order to facilitate public access to government documents, <u>United States</u>

<u>Dept. of State v. Ray,</u> 502 U.S. 164, 173 (1991), the Government is permitted to withhold the

production of certain documents if they fall within selected exemptions set forth in the act.

<u>McDonell v. United States,</u> 4 F.3d 1227 (3d Cir. 1993). In order to support the claimed

exemption, Courts have permitted parties to identify an index of the claimed exemptions called a

"Vaughn Index." <u>Davin v. U.S. Dept. of Justice,</u> 60 F. 3d 1050 (3d Cir. 1995). Courts have also

permitted an exemption to be supported by the use of a "representative sample" of the type of

document sought for protection. <u>Id.</u> at 1053 (citations omitted). The FOIA statute has an

exemption that applies to records or information compiled for law enforcement purposes.

Section 552(b)(7) provides that the following is exempt from disclosure:

> Records or information compiled for law enforcement purposes, but only to the
> extent that the production of such law enforcement records or information...(c)
> <u>could reasonably be expected to constitute an unwarranted invasion of personal</u>
> <u>privacy...</u>

<u>Id.</u> (emphasis added).

To prevail on an Exemption 7 claim, the government must demonstrate that the

information sought be protected was compiled for law enforcement purposes and that disclosure

would constitute an unwarranted invasion of personal privacy. <u>Davin,</u> 60 F.3d at 1054.

---

2  <u>See</u> EEOC Complaints of other Female Corrections Officers attached as (Exhibit "B").

5

The Pennsylvania Right to Know Law, 65 P.S. §66.1-66.4 has a similar exemption to that set forth in FOIA. Section §66.1(2) notes that public records (otherwise subject to disclosure) "shall not mean any report, communication or other paper, the publication of which would disclose the institution, progress or result of an investigation undertaken by an agency in the performance of its official duties...or which would operate to the prejudice or impairment of a person's reputation or personal security." For example, information regarding the qualifications of personnel who administered drug detection equipment in a prison of the Commonwealth was exempted from requirements of disclosure under the Right to Know Act. See Vargo v. Department of Corrections, 715 A.2d 1233 (Pa. Cmwlth. 1988); Nanayakkara v. Casella, 681 A.2d 857 (Pa. Cmwlth. 1996).

The Tredinick report, is a law enforcement document since deals with the operation of a County Correctional Facility and it clearly contains explicit personal information concerning Corrections Officers and inmates which could jeopardize the running of the institution, and the security of the facility, if disclosed.

III.    CONCLUSION

Since the three factors necessary to establish the self-critical analysis privilege have been satisfied and since the document should not be disclosed under FOIA or Right to Know, the report should be kept confidential and should not be turned over for purposes of the existing

lawsuit.

4/26/02

DEVLIN AND DEVINE

BY: _____

David P. Karamessinis, Esquire
Attorney for Defendants

100 West Elm Street
Suite 200
Conshohocken, PA  19428
610-397-4635

7

# EXHIBIT E

520 MARKET STREET • STRAWBERRY SQUARE
P.O. BOX 1268 • HARRISBURG, PENNSYLVANIA 17108-1268
717.234.4161 • 717.234.6808 (FAX)



GOLDBERG, KATZMAN & SHIPMAN, P.C.
ATTORNEYS AT LAW

April 10, 2002

OF COUNSEL
F. LEE SHIPMAN
JOSHUA D. LOCK

ARTHUR L. GOLDBERG
(1951-2000)

HARRY B. GOLDBERG
(1961-1998)

RONALD M. KATZMAN
PAUL J. ESPOSITO
NEIL HENDERSHOT
J. JAY COOPER
THOMAS E. BRENNER
JOHN A. STATLER
APRIL L. STRANG-KUTAY
GUY H. BROOKS
JEFFERSON J. SHIPMAN
JERRY J. RUSSO
MICHAEL J. CROCENZI
THOMAS J. WEBER
STEVEN E. GRUBB
ARNOLD B. KOGAN
ROYCE L. MORRIS
EVAN J. KLINE, III
JOHN DELORENZO
JOHN R. NINOSKY
DAVID M. STECKEL

Via Facsimile 610-861-4665

Jordan B. Yeager, Esquire
**Boockvar & Yeager**
714 Main Street
Bethlehem, PA 18018

Re:    **Tredinnick/Morganelli Reports**
       **Brian Tuddles v. Todd Buskirk, et al.**

Dear Jordan:

This will confirm the agreement we have reached regarding further release of the Tredinnick report or Morganelli letter. You have agreed on behalf of yourself and your client that you will not disseminate the reports outside the parameters of this case, except in a redacted form which removes all identifying information for every individual who participated in an interview with Mr. Tredinnick. I have initiated the preparation of such a redacted form of the report, which I will forward to you shortly for your review.

Based upon this agreement, we concur that it will not be necessary to have a conference call with Judge Brody to resolve the issue. Should I have misstated anything with regard to this understanding, please notify me immediately. If I do not hear from you by noon today, I will contact the Judge's Chambers and indicate our agreement.

Thank you for your cooperation.

Very truly yours,

Thomas J. Weber

TJW/sjb
57666.9

# EXHIBIT F

## WILLIAM BEERS

1

```
 1                 IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3      SUSANNE H. LINN and MELISSA    : NO. 02-4417
        KNESZ,                         :
 4                 Plaintiffs          :
                                       :
 5           vs.                       :
                                       :
 6      NORTHAMPTON COUNTY, et al,     :
                   Defendants          :
 7
 8                 DEPOSITION OF WILLIAM BEERS
 9
10              Taken at the Northampton County Government
11      Center, 669 Washington Street, Easton, Pennsylvania, on
12      Friday, July 2, 2003, commencing at 1:10 p.m., before
13      Patricia A. Lawless, Professional Court Reporter and
14      Notary Public.
15
16      APPEARANCES:
17                      ANNE P. FELKER, ESQ.
                        539 Center Street - PO Box 190
18                      Bethlehem, Pennsylvania 18016
                        -- For the Plaintiffs
19
                        BOOCKVAR & YEAGER
20                      By:  JORDAN B. YEAGER, ESQ.
                        714 Main Street
21                      Bethlehem, Pennsylvania 18018
                        -- For the Plaintiffs
22
                             *  *  *
23                      SLIFER, VOICE & SHADE
                        A Veritext Company
24          3055 College Heights Boulevard, 2nd Floor
                        Allentown, PA  18104
25                       (610) 434-8588
```

VERITEXT PA

WILLIAM BEERS

42

1  Q.    Who?
2  A.    Officer Knesz.
3  Q.    What did she complain about?
4  A.    Mark Keels, when he first came to our shift.
5  Q.    What did she complain about.
6  A.    She didn't come to me to complain. They were
7  in the smoke room talking. Officer Keels started to get
8  up and whisper in her ear, laughed and sat down. Ms.
9  Kensz looked a little uncomfortable. I did not hear what
10 was being said, because I am partially deaf and wasn't
11 sitting listening in. I was having a cigarette and
12 drinking a cup of coffee. But after Officer Keels got up
13 and walked out, I said not to continue whatever he was
14 doing because I wasn't sure if Ms. Knesz was receiving it
15 correctly. I spoke to Officer Keels, then spoke to
16 Melissa Knesz. I asked her if she was having a problem,
17 if she felt uncomfortable. She said, reluctantly; well,
18 yeah, she would like him to stop. I said I would talk to
19 him and I did. I spoke to him. He said he would
20 refrain. She said everything would be fine. I said; let
21 me know if it comes up again.
22 Q.    Any other female officers ever make any
23 complaints to you or did you hear of any complaints about
24 other female officers being harassed by fellow male
25 officers?

43

1  A.    Could you repeat the question please?
2  Q.    Sure. Were there any other female officers
3  who came to you directly or about whom you heard they were
4  having complaints or problems with male officers harassing
5  them?
6  A.    No.
7  Q.    Do you remember an incident of Melissa Knesz
8  coming to you when she was pregnant and telling you that
9  CO Eddie Emery had made a comment to her that she, quote;
10 should have taken it up the ass, end quote?
11 A.    No. I don't remember that.
12 Q.    Did that ever happen?
13 A.    I don't remember hearing Eddie Emery ever
14 saying that or anybody complaining to me about it. I
15 don't remember it.
16 Q.    Does your son work at the prison?
17 A.    Yes.
18 Q.    What is his name?
19 A.    Bruce Newton.
20 Q.    How long has he worked at the prison?
21 A.    Over two years, that I know of right now.
22 Q.    Did you have anything to do with him getting
23 his position there?
24 A.    No.
25 Q.    Have you had complaints filed against you

44

1  anonymously by corrections officers?
2  A.    Not that I know of.
3  Q.    Did you ever think that?
4  A.    I am sorry?
5  Q.    Did you ever think that?
6  A.    Think that?
7  Q.    Yes. Did you ever think that anonymously
8  corrections officers had filed complaints about you?
9  A.    I have known that there has been letters
10 written, unknown to me who they were, who the author was,
11 to the administration.
12 Q.    What do you know about that?
13 A.    Very little. I never saw the letters. I
14 don't recall anybody putting any stock into it. But it
15 was addressed by the warden. He told me things were being
16 said, but they didn't put any stock in it, because nobody
17 is signing the letters -- I'm sorry. It wasn't the
18 warden. It was Lieutenant Garcia.
19 Q.    So he told you there was anonymous complaints
20 in writing made about you?
21 A.    Letters, yes.
22 Q.    Okay. Did you believe him?
23 A.    Yes.
24 Q.    Okay. Did you ever ask to see them?
25 A.    Yes.

45

1  Q.    Did you?
2  A.    Nope. No, I am sorry.
3  Q.    Nope is okay, as long as it's verbal.
4  A.    I am just very tired. I worked eight hours
5  and also got up at 3:00 in the morning.
6  Q.    I will try to get you out of here very soon.
7  A.    That's fine.
8  Q.    Did you get any information from anyone about
9  the content of these letters?
10 A.    No, just complaints of certain things that
11 supposedly other officers are doing and that I am not
12 aware of or that it is -- it was very vague, what I was
13 told.
14 Q.    Do you trust Lieutenant Garcia?
15 A.    Yes.
16 Q.    Did you ever refer to him as a snake?
17 A.    No.
18 Q.    Do you have any idea why Arthur Tredinnick
19 would have in his report that you considered Garcia a
20 snake and you don't trust him?
21 A.    I never made that statement. I have no clue.
22 Q.    You never talked to Arthur Tredinnick?
23 A.    Yes, I did. I was setting officers up for
24 interviews for Tredinnick. I had a conversation with him
25 in the office. I sat down and he asked me a couple

12 (Pages 42 to 45)

VERITEXT PA

WILLIAM BEERS

46

1 questions. I just gave him general answers. I said that
2 he should get a hold of Officer Koch, because he wishes to
3 be on the list. He asked me what I thought about Joe
4 Garcia and I said he was a sneak. I didn't say snake.
5 Q.      What did you just say?
6 A.      Sneak. He is a friend of mine, but he is a
7 sneak. He does his job. That's all I basically said.
8 Q.      If you said sneak, I can understand why he
9 thought you said snake. I thought you just said snake.
10 A.      My apologies. I have a sinus condition too.
11 It goes along with everything else.
12 Q.      That's fine. There was references in the
13 information in Arthur Tredinnick's report about you being
14 cited for having a camera in the prison. Is that what you
15 already described earlier?
16 A.      Yes. They got that incorrect. He asked me
17 if I had any problems. I said I had a problem with the
18 way the one situation was handled with the camera. I said
19 I didn't feel it should have been written. Just to take
20 the good with the bad, I have to do what I have to do. I
21 took my punishment.
22 Q.      What did you mean that Lieutenant Garcia is a
23 sneak?
24 A.      He likes to find things out in his
25 investigations. Sometimes he asks certain questions to

47

1 find out what you know or he would point blank ask you
2 straight out if you didn't have any knowledge. Then he
3 would ask another person to see if they had the
4 knowledge. It's just his nature. That's the way he was.
5 I was a CO with him. I have known him for 20 years.
6 Q.      You mean it's his nature to be --
7 A.      Sneaky. I don't mean it in a bad sense
8 though.
9      MS. FELKER: Let me have a minute out
10 in the hallway.
11      (Whereupon, an off-the-record
12 discussion was held.)
13      MS. FELKER: I do have a few more
14 questions.
15 BY MS. FELKER:
16 Q.      Do you remember the incident you described
17 regarding Officer Keels and Melissa Knesz?
18 A.      Yes.
19 Q.      Are you sure that wasn't Officer Karen Hazard
20 rather than Melissa Knesz?
21 A.      No. It was officer Knesz, that I am sure of.
22 Q.      If she told you it was Officer Karen Hazard,
23 would that make any difference to you?
24 A.      No, because Officer Karen Hazard had her own
25 problems with Mr. Keels in the beginning, and almost

48

1 through the whole time that Officer Keels was there.
2 Q.      Okay. Do you remember an incident where
3 Melissa Knesz was working and she had an emergency at home
4 and asked to leave immediately regarding a flood in her
5 home?
6 A.      Yeah. A plumbing problem, yes, I remember
7 that.
8 Q.      Did you allow her to leave immediately?
9 A.      As soon as I found out what the situation
10 was, yes.
11 Q.      So you didn't make her wait?
12 A.      Not that I recall.
13 Q.      Officer Star, you described the incident
14 involving the inmate. Are you aware that he had any
15 earlier disciplinary write ups or disciplinary issues?
16 A.      Not that I wrote, not that I recall. I never
17 wrote any prior to that.
18 Q.      At the time of that incident, did you have
19 any means of determining what his disciplinary history
20 was?
21 A.      No, I did not. That's not my privilege.
22 Q.      Are you aware that he had any alcohol
23 problem?
24 A.      Yes, I am.
25 Q.      How did you know that?

49

1 A.      Because every time he -- he has belonged to
2 every rehab for helping him with alcoholism almost in the
3 last two and a half, three years of his employment.
4 Q.      I had asked you early on about your write ups
5 of officers and whether any of them had been overturned.
6 You said there were maybe six or seven of them that had
7 been. Which officers were being written up?
8 A.      Jeffrey Lang, Wilbert Fehnell.
9 Q.      Could you spell that last name?
10 A.      F-E-H-N-E-L-L.
11 Q.      Okay.
12 A.      I am tying to remember the other name. Jeff
13 Lang was written up three times, just to let you know. Of
14 the seven, three of them were Jeff Lang. Karen Hazard was
15 one of them. Actually, Karen was -- that's all I can
16 remember for the names. I know Karen Hazard was written
17 up several times after that, but that wasn't all from me.
18 Q.      The three for Jeff Lang, do you know what
19 they were for?
20 A.      Unnecessary roughness in handling, I think
21 was one. I don't know exactly what the charge I wrote
22 was. The other one was total disrespect to a lieutenant.
23 The other one was for disobeying a direct order.
24 Q.      Do you have any idea why these were
25 overturned?

13 (Pages 46 to 49)

VERITEXT PA

# EXHIBIT G

BARBARA MORGAN

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
 3    SUSANNE H. LINN and MELISSA    : NO. 02-4417
      KNESZ,                         :
 4              Plaintiffs           :
                                     :
 5       vs.                         :
                                     :
 6    NORTHAMPTON COUNTY, et al,     :
                Defendants           :
 7
 8              DEPOSITION OF BARBARA MORGAN
 9
10              Taken at the Northampton County Government
11    Center, 669 Washington Street, Easton, Pennsylvania, on
12    Friday, June 27, 2003, commencing at 2:05 p.m., before
13    Patricia A. Lawless, Professional Court Reporter and
14    Notary Public.
15
16    APPEARANCES:
17              ANNE P. FELKER, ESQ.
                539 Center Street - PO Box 190
18              Bethlehem, Pennsylvania 18016
                -- For the Plaintiffs
19
                BOOCKVAR & YEAGER
20              By:  JORDAN B. YEAGER, ESQ.
                714 Main Street
21              Bethlehem, Pennsylvania 18018
                -- For the Plaintiffs
22                       *  *  *
23              SLIFER, VOICE & SHADE
                A Veritext Company
24    3055 College Heights Boulevard, 2nd Floor
                Allentown, PA  18104
25                  (610) 434-8588
```

BARBARA MORGAN

14

1  A.    No.
2  Q.    What language have you heard fellow CO's use?
3  A.    Language they use all the time, foul
4  language.
5  Q.    Be specific.
6  A.    I can't be specific.
7  Q.    We are all grown ups.
8  A.    Men call women bitches sometimes.
9  Q.    Anything else?
10  A.    No.
11  Q.    I am going to ask you some questions about
12  Warden Buskirk. I don't want to put you in an awkward
13  position because Mr. Buskirk is in the room, but I'm
14  afraid I have to do so.
15  A.    Okay.
16  Q.    I do want to tell you, however, that it's
17  completely illegal for you to be retaliated against in any
18  way, shape or form for your testimony today or your
19  participation in any way, shape or form in this kind of
20  legal proceeding?
21  A.    Okay.
22  Q.    So if you fear retaliation or if you are
23  retaliated against, please seek legal counsel for that.
24  What is your opinion about Warden Buskirk's attitude
25  toward women?

15

1  A.    I don't see that he has a negative attitude
2  towards them.
3  Q.    Do you remember talking to Arthur
4  Tredinnick? Do you remember telling him that Buskirk
5  hates women and talks down to them expressing that, quote;
6  I bet he cringes every time he has to take orders from the
7  director, end quote.
8  A.    I was repeating what someone else said.
9  Q.    You're saying that wasn't your opinion you
10  were giving, you were just repeating what someone else
11  said?
12  A.    Right.
13  Q.    Who said that?
14  A.    It was somebody -- I can't remember.
15  Q.    Did you work with Warden Buskirk before he
16  was Warden?
17  A.    Yes, I think so.
18  Q.    And you were aware of some incident of him
19  buying guns from an inmate?
20  A.    I was not aware of that, only through someone
21  else saying it.
22  Q.    Do you remember discussing that with
23  Mr. Tredinnick?
24  A.    Probably only that I had heard it.
25  Q.    How do you get along with Jose Garcia?

16

1  A.    We really don't have any contact.
2  Q.    Do you trust him?
3  A.    No.
4  Q.    Do you think that he has proven himself to be
5  an honest person?
6  A.    No.
7  Q.    There was some reference in information you
8  had given to Tredinnick, and I will read it to you
9  directly, it says; she, meaning you, stated that Amy and
10  she had received bitch-lesbian mail back during the Turly
11  incident. What is that about?
12  A.    We were -- I don't know where all that hate
13  mail started. Everybody was getting these letters around
14  the time of the Turly incident. I guess they had looked
15  into it. I got a letter.
16  Q.    What's the bitch-lesbian reference to?
17  A.    Just to, I don't know, make you feel bad or
18  something.
19  Q.    Did the letter accuse you of being a
20  bitch-lesbian or something?
21  A.    No, just name calling.
22  Q.    Okay. Have you been involved with any
23  inmates at the prison?
24  A.    No.
25  Q.    What is the prison's policy on personal

17

1  contact with inmates?
2  A.    We have an ethics policy.
3  Q.    Do you know whether any employees working at
4  the prison have breached that policy and maintained their
5  jobs at the prison?
6  A.    Yes.
7  Q.    Who do you know for whom that's true?
8  A.    Well, actually, I think -- I don't think the
9  policy was in place while Tara met her ex-husband.
10  Q.    Anyone else?
11  A.    I heard that Sue Pietruskiewicz was. But
12  once again, that's something somebody said.
13  Q.    Okay. Anyone else?
14  A.    I can't think of anyone.
15  Q.    How about Jose Garcia, did you ever hear of
16  him being involved with any inmates?
17  A.    Yes.
18  Q.    Who was the inmate?
19  A.    It was some Hispanic girl.
20  Q.    Was it Louise Hernandez?
21  A.    Yes.
22  Q.    Was she in the Women's Work Release facility
23  or Women's Quarters?
24  A.    I am not sure if she went to Work Release. I
25  do remember her being in Women's Quarters.

5 (Pages 14 to 17)

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BRIAN TUDDLES                  :    CIVIL ACTION NO. 00-CV-3368
      Plaintiff,            :
                                :
   -v-                         :    THE HONORABLE ANITA B. BRODY
                                :
TODD BUSKIRK, et al.           :
      Defendants.           :    JURY TRIAL DEMANDED

## AMENDED COMPLAINT

Plaintiff Brian Tuddles, by counsel, Jordan B. Yeager, Boockvar & Yeager, brings this suit to recover for violations of his federal civil rights, as follows:

## PARTIES

1.     Plaintiff Brian Tuddles is an African-American inmate at the Northampton County Prison, in Easton, Northampton County, in the Commonwealth of Pennsylvania.

2.     Defendant Todd Buskirk is the Warden of the Northampton County Prison. He is sued in his individual and official capacities.

3.     Defendant Cynthia Marakovits is the Director of Corrections for Northampton County. She is sued in her individual and official capacities.

4.     Defendant PrimeCare, Medical, Inc., is a Pennsylvania Corporation which is under contract with Northampton County to provide medical care and services to inmates at the Northampton County Prison.

5.     Defendant Northampton County is a municipal corporation of the Commonwealth of Pennsylvania.

## JURISDICTION AND VENUE

6.    Jurisdiction in this Court is asserted under the provisions of 28 U.S.C. §§1331 and 1343.

7.    Venue is appropriately laid in this Court pursuant to 28 U.S.C. 1391(b) in that the actions complained of took place within the District, the Defendants have carried on business within the District, and Plaintiff resides within the District.

## FACTUAL ALLEGATIONS ON THE MERITS

8.    Mr. Tuddles is seriously ill and Defendants' actions and inactions over the past several months have exacerbated his illness.

9.    On December 6, 1999, the Court of Common Pleas of Northampton County sentenced Mr. Tuddles to a period of confinement in Northampton County Prison.

10.    The Court stated to Mr. Tuddles that one of purposes behind the sentence was: "to keep you available to your present treating physician.  I gather that you have recently had two surgeries and information I have been given is that you need -- you can be managed most effectively by your current physicians.  You may be released from Northampton County Prison for medical treatment.  So my entire plan here is to maintain the continuity of your medical treatment. . . . "

11.    Defendants have, at all relevant times, been aware of Mr. Tuddles' medical needs.

12.    Since his commitment to Northampton County Prison. Mr. Tuddles has experienced further medical problems which have been complicated by the Defendants' poor handling of his care.

2

13.    Mr. Tuddles has undergone surgery again and has been diagnosed with pneumonia.

14.    Defendants have endangered Mr. Tuddles's health by failing to follow the directions of Mr. Tuddles' treating physicians.

15.    Defendants have forced Mr. Tuddles to be treated first at the Prison by PrimeCare doctors, rather than his own doctors.

16.    This has resulted in Mr. Tuddles being prescribed inappropriate medications that his primary treating physician has later needed to correct.

17.    When appointments are ultimately arranged with his own doctors, Mr. Tuddles is not released to receive treatment; he is maintained in Prison custody and transported by Prison guards, as scheduling permits, and they remain with him throughout his doctor visits and treatments.

18.    Because the Prison has not been able to arrange transportation as needed, there have been constant delays in Mr. Tuddles being examined and treated.

19.    Mr. Tuddles often has to wait a week to see his physician.

20.    He has had to wait as long as three weeks for needed medical equipment and over two weeks for follow-up chest x-rays.

21.    The events of early March 2000 are instructive.

22.    On March 8, 2000, Mr. Tuddles had undergone preparations necessary for a C/T Scan scheduled for that day, which his doctor ordered because nodules had just been found on his lungs.

3

23.    Defendants canceled the C/T Scan at the last minute – reportedly due to a lack of transportation – and it was not rescheduled until nearly ten (10) days later, March 17, 2000.

24.    Because of the delays in getting the C/T Scan done, a follow-up appointment with Mr. Tuddles's treating physician was canceled.

25.    As soon as the results became available, he had to be admitted to the hospital for follow-up tests and care.

26.    Additional delays have been caused by the Defendants' refusal to pass information along to Mr. Tuddles from his physician.

27.    For example, because Defendants did not inform Mr. Tuddles that he was scheduled for surgery on March 29, 2000, he was not able to follow the required pre-operative procedures and the surgery had to be postponed for over a month.

28.    Further, because Defendants have ordered guards to be present during every moment of his doctors' exams, Mr. Tuddles has been denied basic privacy rights.

29.    As a result, Mr. Tuddles' private medical information has become common knowledge among the prison guards and administration.

30.    Defendants have also used the presence of the guards in the medical exams to question the prescriptions being ordered by Mr. Tuddles' physician, despite the fact that Defendants have no right to engage in such interference.

31.    When prescriptions are written, Defendants have often failed to fill Mr. Tuddles' prescriptions.

32.    Also, despite Mr. Tuddles' need for a specialized diet, Defendants have failed to make the required adjustments.

4

33. Perhaps the most egregious problem of all has been Defendants' repeated failure to give Mr. Tuddles all the required doses of his medication.

34. According to Defendants' own records, they have failed to give Mr. Tuddles his required medication on at least eleven (11) different dates.

35. As Mr. Tuddles' treating physician has stated and as Defendants have been aware, "the need for maintaining these medications without missed doses is imperative . . ."

36. Mr. Tuddles' qualifies for the prison's work release program.

37. Nonetheless, Defendants have denied Plaintiff admittance into the work release program.

38. Defendants have abused their authority in their administration of the work release program and in denying Plaintiff admittance into the program.

39. Defendants have denied Plaintiff admittance into the work release program because he is an African-American man with a disability and because he has petitioned the government for redress of grievances.

40. In doing so, Defendants have denied Plaintiff his federal civil rights, including his right to be free from discrimination on the basis of race and disability, his rights under the First Amendment, his right to be free from arbitrary and capricious administrative decision making.

41. In a concerted effort to address these problems, Mr. Tuddles has -- on his own, through his wife, and through counsel -- exhausted any and all administrative remedies.

42. Defendants have acted with deliberate indifference toward Mr. Tuddles' serious medical needs, in that they knew of the substantial risk of serious harm to Mr. Tuddles and they ignored that risk.

5

43.    Defendants' actions and inactions have amounted to unnecessary and wanton infliction of pain.

44.    Defendants' actions and inactions toward Mr. Tuddles have caused Mr. Tuddles physical and emotional injury and have significantly aggravated his medical condition.

45.    Defendants have violated Mr. Tuddles' clearly established and well settled federal constitutional rights, including his right to be free from deliberate indifference to his serious medical needs.

46.    The conduct of Defendants shocks the conscience, in that they had an intent to physically harm Mr. Tuddles and/or to worsen his plight; Defendants thereby violated Mr. Tuddles' substantive due process rights.

47.    Defendants acted with callous indifference toward Mr. Tuddles' federal rights.

48.    As a direct and proximate result of the Defendants' unconstitutional actions against Mr. Tuddles, he has suffered grievously and needlessly, including, without limitation, the loss of his liberty, injury to his body, and the incurring of severe emotional distress.

## COUNT I - 42 U.S.C. § 1983 - VIOLATION OF EIGHTH AMENDMENT RIGHTS

49.    The allegations of all the preceding paragraphs of this Complaint are realleged herein as if fully set forth.

50.    Defendants, acting under color of law, denied Mr. Tuddles his rights under the Eighth Amendment to the United States Constitution in violation of the Civil Rights Act of 1866. as amended, 42 U.S.C. § 1983.

51. As a direct and proximate result of the aforesaid, Mr. Tuddles has been damaged as alleged.

## COUNT II - 42 U.S.C. § 1983 – VIOLATION OF FOURTEENTH AMENDMENT RIGHTS

52. The allegations of all the preceding paragraphs of this Complaint are realleged herein as if fully set forth.

53. Defendants, acting under color of law, denied Mr. Tuddles his rights to equal protection and substantive due process under the Fourteenth Amendment to the United States Constitution, in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1983.

54. As a direct and proximate result of the aforesaid, Mr. Tuddles has been damaged as alleged.

## COUNT III - 42 U.S.C. § 1983 – VIOLATION OF FIRST AMENDMENT RIGHTS

55. The allegations of all the preceding paragraphs of this Complaint are realleged herein as if fully set forth.

56. Defendants, acting under color of law, have denied Mr. Tuddles his rights under the First Amendment to the United States Constitution, in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1983.

57. As a direct and proximate result of the aforesaid, Mr. Tuddles has been damaged as alleged.

## COUNT IV - VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

58.    The allegations of all the preceding paragraphs of this Complaint are realleged herein as if fully set forth.

59.    Defendants are denying Mr. Tuddles his rights under the Americans with Disabilities Act, 42 U.S.C. § 12131.

60.    As a direct and proximate result of the aforesaid, Mr. Tuddles has been damaged as alleged.

## COUNT V - 42 U.S.C. § 1983 – DEFENDANT NORTHAMPTON COUNTY

61.    The allegations of all the preceding paragraphs of this Complaint are realleged herein as if fully set forth.

62.    Prior to the events described herein, Northampton County developed and maintained policies, practices and/or customs exhibiting deliberate indifference to the constitutional rights of persons within the Northampton County Prison, which caused violations of Mr. Tuddles' rights.

63.    It was the policy, practice and/or custom of the Northampton County to inadequately and improperly investigate and scrutinize the backgrounds of prospective prison administrators and medical providers, including those identified herein.

64.    As a result, Northampton County retained administrators and medical providers, including those identified herein, who have deprived the federally protected rights of people with whom they have come into contact, including Mr. Tuddles.

8

65.    This deprivation of rights was the plainly obvious consequence of the County's failure to adequately and properly investigate and scrutinize the backgrounds of prospective administrators and medical providers.

66.    It was the policy, practice and/or custom of Northampton County to inadequately and improperly investigate complaints regarding conditions at the Prison, and acts of misconduct were instead tolerated by the County.

67.    It was the policy, practice and/or custom of Northampton County to inadequately supervise and train its administrators and medical providers, including those identified herein, thereby failing to adequately discourage further constitutional violations on the part of these officials.

68.    Northampton County did not require appropriate in-service training or re-training to prevent constitutional violations.

69.    As a result of the above-described policies, practices and customs, administrators and medical providers of the Northampton County Prison, including those identified herein, believed that their actions would not be investigated or sanctioned, but would be tolerated.

70.    The above described policies, practices and customs demonstrated a deliberate indifference on the part of policymakers of Northampton County to the constitutional rights of persons within the Prison, and were the cause of the violations of Mr. Tuddles' rights as alleged herein.

71.    As a direct and proximate result of the aforesaid, Mr. Tuddles has been damaged as alleged.

REQUESTED RELIEF

WHEREFORE, Plaintiff requests that the Court find and determine, after trial by jury as appropriate, that the Plaintiff has suffered substantial and continuing injury as a result of deprivation of his civil and Constitutional rights, and otherwise wrongful conduct, and award the following relief, as appropriate:

(a)    Declaratory relief;

(b)    Appropriate injunctive relief, including an injunction requiring Defendants to provide Mr. Tuddles with all appropriate medical care and, if such initial injunction does not fully remedy the constitutional violations, an injunction modifying Mr. Tuddles' conditions of confinement so that he can provide for his own medical care;

(c)    Compensatory damages in excess of $150,000;

(d)    Prejudgment interest, attorneys' fees and costs;

(e)    Punitive damages as appropriate;

(f)    Such other legal and equitable relief as the Court deems just and proper.

JURY TRIAL DEMANDED

Date: 9/7/00

JORDAN B. YEAGER
Attorney I.D. No. 72947
BOOCKVAR & YEAGER
714 Main Street
Bethlehem, PA 18018
610-861-4662
Counsel for Plaintiff Brian Tuddles

10

CERTIFICATE OF SERVICE

I certify that I am serving a copy of the foregoing on the following counsel on this date by first class US mail, postage paid:

Thomas J. Weber, Esquire
John R. Ninosky, Esquire
Goldberg, Katzman & Shipman, P.C.
320 Market Street
P.O. Box 1268
Harrisburg, PA 17108-1268

Date: 9/7/00

Jordan B. Yeager